**The below described is SIGNED.**

**Dated: June 24, 2011**

_____
**WILLIAM T. THURMAN**
**U.S. Bankruptcy Chief Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>JL BUILDING, LLC,<br><br>Debtor. | Bankruptcy No. 08-27671<br><br>Chapter 7 |

**MEMORANDUM DECISION REGARDING MOTION TO SELL COMMERCIAL REAL PROPERTY AND TO ASSUME AND ASSIGN REAL ESTATE LEASES**

The matter before the Court is the Trustee's motion seeking authority to sell certain real property ("Motion"). The Trustee also seeks authority to assume the leases pertaining to the subject real property and assign those leases to the buyer. The Court conducted a hearing on the Motion on June 6 and 7, 2011, and received evidence and arguments. Attending the hearing were Peggy Hunt, the chapter 7[1] trustee ("Trustee" or "Ms. Hunt")), and her attorneys, Scott Cummings and Cameron Hancock of Dorsey & Whitney; Mona Burton of Holland & Hart for American Equity Life Investment Insurance ("American Equity"); James Anderson of Miller

---

[1] All statutory citations refer to title 11 of the United States Code (2006) unless otherwise identified.

Guymon for McGillis Investment Co. ("McGillis"); David Billings of Parsons Behle & Latimer for First Interstate Financial ("FIF"); Seth Mott of Van Cott Bagley for Station Park;[2] Russell Walker of Woodbury & Kesler as counsel for JL Building;[3] and Chris Schmutz of Schmutz & Mohlman for JL Building #2 ("JL2").[4]  The Court has considered the pleadings and documents filed by the Trustee and other interested parties in connection with the proposed sale including the Motion and all accompanying exhibits, the response of American Equity, the opposition filed by JL, prior orders of the court, and all other pleadings and affidavits filed in connection with this matter.  The Court also heard and received other evidence, including the testimony of Scot Boley,

---

[2]  It is noted that the second mortgage claim is in actuality one claim, but owned by 3 separate entities, i.e. FIF, McGillis and Station Park.  Accordingly, although one collective claim, 3 different entities own portion of the same claim.  The Court will refer to all 3 parties as the "FIF Parties."

[3]  The Court notes the holding of the Court of Appeals for the Tenth Circuit in C.W. Mining v. Aquila (In re C.W. Mining), 636 F.3d 1257 (10th Cir. 2011), that explains that only a chapter 7 trustee in a corporate case may represent a debtor once that trustee is appointed.  The court reasoned that a corporation cannot act on its own and thus requires an agent to act on its behalf.  In a chapter 7 proceeding, the appointed trustee "assumes control of the [debtor-corporation] and the debtor's directors are 'completely ousted.'" Id. at 1262 (citing Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 352–53 (1985)).  Thus, authority to make legal decisions on behalf of the corporation is the responsibility of the trustee. The circuit court has held that following the appointment of a trustee in a corporate chapter 7 bankruptcy, the trustee is the only party authorized to appeal a court order on the debtor's behalf.  The court finds this reasoning persuasive in other matters, such as the present motion.  Thus Mr. Walker and Mr. Schmutz who previously represented the debtors in possession during the chapter 11 portion of this case, may technically not be entitled to advocate in favor of the Debtors in their chapter 7 cases.  They were hired by management of the Debtors, who, according to the Weintraub case from the U.S. Supreme Court, have been "ousted."  Still, for the sake of simplicity, the Court will refer to Mr. Walker's client as JL and Mr. Schmutz's client as JL2 throughout this Memorandum.  Further, the Court has considered their position in making this ruling.

[4]  Because Mr. Schmutz represents an entity not directly involved in this Motion, it is unclear what standing Mr. Schmutz's client had to be heard on this Motion.  Nevertheless, the Court permitted Mr. Schmutz to argue against the Motion for his client and the Court has considered the same.

the Trustee's realtor; the Trustee; and Steven Bates, a principal of the owner of the Debtor.

The Court has ruled on this Motion in open court and submits now this Memorandum Decision ("Memorandum") which is a memorialization of the Court's oral ruling. This Memorandum shall thus constitute the Court's findings and conclusions.

## JURISDICTION

The Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O). Venue is appropriate under 28 U.S.C. § 1408. Notice of the hearing on this Motion is found to be appropriate and adequate in all respects. A reasonable opportunity to object and be heard with respect to the Motion has been afforded to all interested persons and entities.

## PROCEDURAL STATUS

The Debtor's case was filed under chapter 11 in 2008 with a sister case of JL Building #2 (the "Debtors"), which were jointly administered. Based on an earlier motion filed by the U.S. Trustee, the Court issued an order stating that unless the Debtors obtained confirmation of a plan by April 28, 2011, their cases would be converted to chapter 7. On April 28, 2011, at the conclusion of an evidentiary hearing on the Debtors' request for confirmation of their plan, the Court denied the Debtors' request and converted the cases to ones under chapter 7, effective from the bench. An Order memorializing the ruling was entered on May 10, 2011. No stay has been sought as to that Order.

On April 29, 2011, Ms. Hunt was appointed as the chapter 7 trustee for the Debtor. The Court granted the Trustee's motion to operate the business of the Debtor and use cash collateral on May 16, 2011. No objection was made to the appointment of the Trustee or the Trustee's

3

separate motion seeking authority to operate the business or use cash collateral. The Trustee has marketed and is currently seeking an additional order from the Court authorizing a sale of the building (the "Building") of the Debtor's estate pursuant to § 363(b)(1)[5] and (f)[6], with a finding of good faith on behalf of the buyer for purposes of § 363(m)[7].

There is a disputed second mortgage claim held by the FIF Parties against this property which is discussed hereafter. The holders of that disputed claim consented to the sale. The holder of the first mortgage—American Equity—has consented to the sale, but requests all of the sales proceeds.

In a docket pleading entitled Debtor's Objection, JL has objected to the Trustee's Motion. However, there is a question as to the JL's standing which is addressed hereafter and at footnote 3.

---

[5]  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."

[6]  "The trustee may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if--
    (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
    (2) such entity consents;
    (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
    (4) such interest is in bona fide dispute; or
    (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

[7]  "The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal."

## FACTS

**A.     Building**

On December 31, 2008, the Debtor filed its amended statements and schedules which lists the Building on Schedule A.[8] Schedule G listed 5 commercial leases in the Building.[9] There is also a short-term seasonal commercial lease for space in parking lot of the Building.[10] The Building and Leases are essentially all of the Debtor's assets, although there are some intangible assets.[11] The Debtor is not in default under any of the Leases and there are no cure amounts currently owing.[12]

The Trustee has recently been notified that the lessee American Family Insurance, which leases Building "Suite 103," intends to terminate its lease.[13] That tenant has now moved out. However, a new tenant will take the space, although for a lower monthly rent.

**B.     Marketing, Price and Value**

The Building has been listed for sale and actively marketed for at least 18 months, which includes 9–10 months with Tim Simonsen of Coldwell Banker Commercial, who Steven Bates (a principal of the owner of the Debtor) said was the number 1 real estate salesman in the country, at an asking price of approximately $2,700,000.00, and the remaining months since September

---

[8]    ECF No. 28.

[9]    See id.

[10]   See id.

[11]   See id.

[12]   See Hunt Aff. ¶ 6, ECF No. 140.

[13]   See id. ¶ 5.

2010 with Scot Boley and his firm cRc Nationwide ("CRC"). No offers to purchase the Building were presented to the Debtor during the time it was marketed by Mr. Simonsen.

The Debtor did not seek court approval for the employment of either professional; the Trustee, however, filed an Application to Employ CRC as a real estate broker on May 17, 2011, which has been approved.[14] The previously submitted disclosure statement made no mention of the engagement of a realtor or an offer.[15]

When the Debtor changed its real estate broker in September 2010, CRC was retained to market and sell the Building, as well as to serve as a leasing agent. From that date to the date of the hearing, CRC developed marketing plans for sale and lease of the Building and actively marketed the Building for sale.

The Building was listed for sale by the Debtor with CRC at that time at an asking price of $2,472,477.60—which discrepancy from the earlier figure used by Mr. Simonsen suggests, inter alia, confidence of the Debtor in Mr. Boley's assessment of value—and this remains the current listing price with the Trustee. This price is based upon the desirability of the location; the nature of the leases and income generated from those leases; and the current market conditions, including cap rates and comparable sales.[16] Additionally, in January 2011, Mr. Bates as "Seller" signed a Purchase Letter of Intent for $2.390 million.[17] The buyer was to be Northwest Land &

---

[14]   See generally ECF Nos. 135, 156.

[15]   See Case No. 08-27670, ECF No. 185.

[16]   Mr. Bates placed much emphasis on cap rates in his testimony. It is the Court's belief, however, that cap rates alone are not the sole driving force of value.

[17]   Ex. 7.

6

Development LLC ("NLD").[18]

### C. Offer

In approximately April 2011, an offer to purchase the Building for a cash payment of $2,365,000.00 was presented to CRC (the "Offer") from NLD, which CRC in turn presented to the Debtor. The Debtor did not respond to the Offer.

Upon her appointment, the Trustee learned about the Offer and immediately contacted CRC. The Trustee and CRC discussed the Building, CRC's marketing of the Building, and the Offer. CRC also informed the Trustee about the details and desirability of the Offer. After which, the Trustee with CRC and NLD entered into good faith and arm's length negotiations related to the sale of the Building.

### D. Agreement

On May 17, 2011, NLD, through its real estate agent, submitted an executed Commercial Real Estate Purchase Contract[19] to the Trustee offering to purchase the Building for a cash payment of $2,365,000.00, "as is," provided that the sale closes by no later than June 8, 2011, as part of a 1031 exchange (the "Purchase Agreement"). The Purchase Agreement represents the deal that the Trustee has negotiated with NLD, and she has accepted the offer made therein subject to approval of this Court.

NLD has made a $25,000.00 earnest money deposit, which will be credited against the total purchase price at the closing of the proposed sale, with the balance of the purchase price to be paid in cash. The proposed sale is not, therefore, subject to an appraisal or buyer financing.

---

[18] See ex. 7.

[19] Ex. 5.

The Trustee has agreed to pay CRC no more than 6% of the sales price of the Building as a sales commission, which commission, consistent with agreements entered into in the real estate profession, will be paid one-half to CRC and one-half to NLD's agent at the time of closing. Additionally, pursuant to an agreement between CRC and NLD, CRC has agreed to place in escrow from its commission, up to the equivalent of 1 year of rent historically paid by American Family Insurance to cover the difference in rent paid by the subsequent tenant in "Suite 103" as compared to American Family Insurance (the "Escrow Funds"). The Trustee is not a party to the agreement between CRC and NLD, and the estate is not liable for any disputes that might arise between CRC and NLD. Although the purchase price for the Building is based, in part, on the rents generated therefrom, no price concessions have been made to NLD for the lower rent to be paid by the new tenant of "Suite 103." This issue is being dealt with in the NLD-CRC agreement related to the Escrow Funds. So, in effect, the price reflects the Building fully leased, with the realtor to make up any loss in rent from his commission.

The Trustee has received Court authority to operate the Debtor's business for a period of only 6 months commencing on May 16, 2011. If this sale does not close, the Trustee will only have that time to market and sell to another buyer. It generally takes 6 months to generate an offer on a building like this.

## SECURED INTERESTS

The following interests against the Building have been asserted:

1. A trust deed recorded February 6, 2006, for the benefit of American Equity;

2. A trust deed recorded December 6, 2007, for the benefit of the FIF Parties;

8

    3.    A notice of mechanic's lien recorded October 1, 2008, by C & A Doors and Millwork, L.L.C.; and

    4.    A UCC fixture filing recorded January 10, 2011, by Zions First National Bank in connection with the space leased by American Family Insurance

(collectively, the "Purported Liens and Interests"). The Trustee currently is reviewing the nature, extent, validity and priority of the Purported Liens and Interests.

The Trustee proposes to the sell the Building free and clear of liens and interests pursuant to § 363(b) and (f), with the Purported Liens and Interests attaching to the proceeds of the sale, after the deduction of the costs of sale, including CRC's commission and any outstanding property taxes and assessments (the "Net Sale Proceeds").

## ANALYSIS AND CONCLUSIONS

**A.    Sale**

The Trustee seeks entry of Order authorizing the sale for $2,365,000 free and clear of all interests pursuant to § 363 (b), (f) and (m) and Federal Rules of Bankruptcy Procedure 2002, 6004 and 9014, with all Purported Liens and Interests in the Building to attach to the Net Sales Proceeds. The Trustee also requests authorization to assume and assign the leases of the space in the Building to NLD.

Section 363(b)(1) allows a trustee, after notice and a hearing to sell property of the estate outside the normal course of business. A trustee must show (a) a sound business reason exists to sell the property; (b) adequate and reasonable notice including a full disclosure of the sales terms has been given to parties in interest; (c) the sales price is fair and reasonable; and (d) the buyer is

9

acting in good faith.[20]

The proposed sale is a sound and prudent exercise of the Trustee's reasonable business judgment and is in the best interest of the estate and creditors. The Court has been furnished with neither sufficient evidence nor reasons to challenge the reasonableness of the business judgment in this regard nor a showing that it is an abuse of the business judgment or the Trustee's discretion. In addition, Courts should show deference to a trustee's decision making,[21] where there is no showing of an abuse of discretion[22]. In this case, the Trustee's conduct of negotiating the sale and seeking approval was done in good faith and represents a sound and prudent exercise of business judgment. The Trustee has demonstrated good, sufficient and sound business purposes and justification for this sale outside the ordinary course of business.

As to the second factor of Medical Software, the Court previously found notice of the Motion was appropriate. Further, the Trustee has provided adequate disclosure of the terms of the sale as required under 363 and Federal Rule of Bankruptcy Procedure 2002 and 6004.

Thirdly, the proposed sales price of $2,365,000 is a fair and reasonable price for the Building based on, but not limited to, the length of time the building has been on the market (over 18 months) with this being the first offer received on the building; the testimony of Mr. Boley—a qualified professional—that the purchase price is fair and reasonable, particularly in light of the fact it is a cash offer with no contingencies; the time limitation based on the 6-month authorization the Trustee has to run the Debtor's business, considering that if NLD's offer is not

---

[20]     In re Med. Software Solutions 286 B.R. 431, 439–40 (Bankr. D. Utah 2002).

[21]     See In re Summit Land Co. 13 B.R. 310, 316 (Bankr. D. Utah 1981).

[22]     In re Curlew Valley Assoc., 14 B.R. 506, 509, 513–14 (Bankr. D. Utah 1981).

accepted, it will likely take at least an additional 6 months to sell given current conditions; and the fact that "Suite 103" is leasing for less than before. Further, there are no guarantees of renewal of the other leases that terminate next year. Significantly, the price is similar to which Mr. Bates agreed in a Purchase Letter of Intent in January 2011.[23] Even though JL does not have standing to object, the Court has considered its objection that the price is insufficient and overrules it for the reasons explained above.

Finally, the Court finds NLD acted in good faith and is a good faith purchaser. This was an arm's length transaction, and NLD has not engaged in any fraud, collusion or attempted to take unfair advantage of other potential purchases. This finding will be sufficient to invoke the protections of § 363(m).

    **B.**    **Proceeds**

The secured claims of American Equity and the FIF Parties exceed the value of the Building (American Equity: $972,798.73; FIF Parties: $2,273,233). The property is also subject to a purported mechanics lien and a lien by Zions[24]. The Trustee or the Debtor has challenged the validity of most or all of these claims, however, so the Court will order that the proceeds of this sale less closing costs, be held in escrow, in accordance with the explanation below, pending further order of the Court.

Some months ago, the Debtors commenced an adversary proceeding against the FIF

---

    [23]    While Mr. Bates argued that the signed letter of intent did not constitute a contract, the Court believes, based on the Parol Evidence Rule, that a good argument could be made that he could be bound by such.

    [24]    The Zions lien appears to have been filed after the bankruptcy case so it may be void or it may attach to only the leasehold interest of the tenant.

11

Parties alleging that their claims were or should be determined to be zero as the Debtors allege that the FIF Parties did not conduct a proper foreclosure on other property (which was never property of this estate but was cross collateralized), and as a result, the balance of their claim remaining after foreclosure should be eliminated. The Trustee has not indicated whether she will proceed with that adversary proceeding. As a result of the adversary proceeding however, the Court orders that the proceeds of sale from the Building which might otherwise have been disbursed to the FIF Parties remain in escrow pending further order of the Court.

American Equity also claims its debt held by JL2 is cross-collateralized against the Building and thus there is an additional $1,626,589.92 owed to it from this sale. American Equity is asserting the entire proceeds from the sale should be turned over to it. The Court acknowledges, however, that the trustee of JL2 is in the process of marketing that building for sale and has been given permission to operate the building during the marketing period. Although American Equity may have a right to the proceeds from this sale per the cross-collateralization of the debt, the Court reserves this determination. Additionally, the Trustee asserted during the hearing that she is investigating American Equity's first mortgage to determine the extent of its validity.

The Court will allow payment only of the closing costs including realtor fees and taxes, and all remaining proceeds are to be escrowed and the Trustee shall not make any disbursement of the remaining proceeds from this sale until further order from the Court. This will provide an opportunity for the Trustee to thoroughly analyze all claims to maximize the return to creditors, claimants and possibly interest holders. Further, additional hearings on the claims, with opportunity for additional argument and evidence, will benefit all parties.

### C. Economic Impact

As an additional basis for the Court's ruling, the Court recognizes that there are significant economic interests at stake here which are protected by this ruling:

1. American Equity has the first mortgage. It has a significant amount due it on its first mortgage. It may well be entitled to be paid a significant amount from this sale. It appears to be adequately protected for its first mortgage on the JL2 building. It is getting payments on that mortgage and there is either a cure arrangement in place to become current or payments are otherwise current now. Deferring, for the time being, its claim to be paid all of the proceeds is consistent with its original bargain. Furthermore, the Court has had insufficient evidence presented to it for determining the propriety of its cross-collateralization claim.

2. The FIF Parties' claim is disputed. Should they ultimately be determined to have a valid lien, they will have to dispute their entitlement with American Equity on its cross-collateralization claim. Accordingly, deferring payment to them at this point will give the Trustee a chance to evaluate their claims, while, at the same time, should they be entitled to paid from this sale, the proceeds are protected.

3. The unsecured creditors are also protected as the proceeds from this sale will be placed in escrow, and, in the event that the FIF Parties' claims are reduced or eliminated, those funds will be available to the unsecured creditors.

    4.      Finally, the interest of the owner will be preserved for the time being. In the event the Trustee elects to continue with the pending adversary proceeding against the FIF Parties and is successful, the interest of the owner stands in line to be paid, subject, of course, to any valid claims of American Equity, the unsecured creditors and allowed administrative claims.

This sale approval, therefore, in the Court's opinion, meets the requirements and policy of chapter 7 as it allows for a prompt liquidation of an estate. This sale liquidates the main asset of the Debtor for a price that is over 95% of the price at which the Debtor had listed it in the latter part of 2010. Further, the price is within a few thousand dollars of the Purchase Letter of Intent signed by Mr. Bates earlier this year. Accordingly, the value is evidenced by these factors and is consistent with current market trends. Any suggestion that time will prove that the value is greater or that a better offer will materialize is subject to the vicissitudes of the market. One never knows what will happen. There has already been one tenant which has terminated its lease. Others may follow. It is hoped they won't, but that is a risk. Further, this Court is favorably impressed with the adage that a "bird in the hand is worth more than 2 in the bush."

JL's objection that the sale should be deferred for additional marketing is diluted and hampered by its prior failure to advise the creditors and the Court of its efforts to list and sell the Building. Further, the Court is concerned that the Debtor kept its Purchase Letter of Intent to NLD to the principals of the owner of the Debtor only. The policy of full and complete

disclosure required by the Bankruptcy Code[25] suggests that the objections of these principals who formerly controlled the Debtor should not carry much weight.

Finally, if the Trustee is ultimately successful in eliminating the second mortgage claim of the FIF Parties, and American Equity's cross collateral claim is paid from the proceeds of the sale of the building of JL2, then the principals or owner of the Debtor stands to receive those funds which will be held in escrow by this ruling. Accordingly, the Debtor and its principals are not prejudiced to any significant degree. Although Mr. Bates testified at the 341 meeting that he wanted the cash flow from JL for his retirement, our circuit court has explained that "the major purpose for [a corporation's] continued existence is maximizing the value of the estate for its creditors, not its shareholders."[26]

## CONCLUSION

In summary, the consideration being paid by NLD represents and constitutes reasonably equivalent value and fair consideration under the code and laws of the United States. The sale agreement was proposed, negotiated and entered into by the parties without collusion, in good faith and from arm's length bargaining positions. The Court specifically finds the buyer has exercised good faith to qualify for protection under § 363(m). The terms of the sale agreement, including the price, are fair and reasonable. Good and sufficient reasons for approval of the sale have been articulated. The relief requested in the Motion, shown by the argument before the

---

[25] See In re Valley Park Group, Inc., 96 B.R. 16, 23 (Bankr. N.D.N.Y. 1989) (citing legislative history at H.R. Rep. No. 595, 95th Cong., 1st Sess., 224, 408–09, reprinted in 1978 U.S.Code Cong. & Admin. News 5963, 6183-84, 6365) ("Anything short of voluntary and honest disclosure obstructs the policy of Chapter 11 . . . .").

[26] C.W. Mining, 636 F.3d at 1265.

Court and evidence, is in the best interest of the estate and its creditors and even the equity holders. The Trustee may sell the property free and clear of all liens, liabilities, and adverse claims of ownership (if any). The Court also approves the assumption and assignment of leases.

The Trustee is authorized to pay closing costs, any real estate taxes, and commissions of 6%. The Trustee is not liable for any agreement between CRC and NLD regarding additional escrowed funds. All remaining proceeds are to be deposited into an account controlled only by the Trustee. Any creditor or other party in interest may bring a motion to disburse the funds pending resolution of any of those matters discussed above.

It is in the interest of the estate, its creditors and its equity holders that the sale of the property not be delayed pending a final judgment. The sale agreement has not been entered into for the purpose of hindering, delaying or defrauding creditors.

The Trustee has full corporate and other statutory power and authority to execute the sale agreement and all other documents contemplated thereby, and to consummate the transactions contemplated by the sale agreement. The transfer of the property to the buyer will constitute a legal, valid and effective transfer of the property and will upon closing, vest the buyer with all right, title and interest of the Debtor to the property free and clear of all liens and claims. Any valid claims, liens or adverse interest shall attach to the sales proceeds, which will be distributed only as provided in this Memorandum and the accompanying Order.

Good and sufficient cause has been articulated and the Court finds and determines that the waiting period provided by Rule 6004(h) should be and is hereby waived.

An Order enforcing this Memorandum has already been entered.

_____END OF DOCUMENT_____



oo00–00oo

# SERVICE LIST

Service of the foregoing **Memorandum Decision** will be effected through the Bankruptcy Noticing Center to each party listed below:

Peggy Hunt
Cameron M. Hancock
Scott A. Cummings
Dorsey & Whitney LLP
136 South Main Street
Suite 1000
Salt Lake City, UT 84101-1655

Mona L. Burton
Holland and Hart
222 S. Main Street
Suite 2200
Salt Lake City, UT 84101

James W. Anderson
Miller Guymon, P.C.
165 South Regent Street
Salt Lake City, UT 84111

Russell S. Walker
Woodbury & Kesler
265 East 100 South
Suite 300
Salt Lake City, UT 84111

David P. Billings
Parsons, Behle & Latimer, P.C.
201 South Main Street
Suite 1800
Salt Lake City, UT 84111

Seth M. Mott
Van Cott, Bagley, Cornwall & McCarthy
36 South State Street
Suite 1900
Salt Lake City, UT 84111-1478

Chris L. Schmutz
Schmutz & Mohlman
533 West 2600 S
Ste 200
Bountiful, UT 84010

Laurie A. Cayton
US Trustees Office
Ken Garff Building
405 South Main Street
Suite 300
Salt Lake City, UT 84111